UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| NEW YORK STATE CATHOLIC HEALTH PLAN, INC., d/b/a FIDELIS CARE NEW YORK,<br><br>            Plaintiff,<br><br>     – against –<br><br>ACADEMY O & P ASSOCIATES, *et al.*,<br><br>            Defendants. | **MEMORANDUM AND ORDER**<br><br>15-CV-3298 |

**Appearances**

**Plaintiff**

**New York State Catholic Health Plan, Inc.**
*doing business as*
Fidelis Care New York

**Christopher J. Kutner**
**Joshua D. Smith**
**Justin A. Calabrese**
**Matthew Thomas Feinman**
**Max Saulter Gershenoff**
**Barry I. Levy**
Rivkin Radler LLP
926 RXR Plaza
Uniondale, NY 11556
516-357-3000

**Defendant**

**Academy O & P Associates**

**Harold J. Levy**
**Richard J. Quadrino**
Quadrino Law Group PC
225 Broad Hollow Rd
Suite 304
Melville, NY 11747
631-815-5800
631-574-4550

Jeffrey M. Eilender
Richard Henry Dolan
Andrew Seth Harris
Lyndon Mitchell Tretter
Michael Adrian Battle
Niall Diarmuid O'Murchadha
Schlam, Stone & Dolan
26 Broadway
New York, NY 10004
212-344-5400

**Defendants**

**Academy Orthotic and
Prosthetic Associates IPA, Inc.**
*formerly known as*
Academy Orthotic & Prosthetic
Associates, Inc.,
**Isaac Stein,
Harry Daskel**

Harold J. Levy
Richard J. Quadrino
Quadrino Law Group PC
225 Broad Hollow Rd
Suite 304
Melville, NY 11747
631-815-5800
631-574-4550

Jeffrey M. Eilender
Richard Henry Dolan
Andrew Seth Harris
Lyndon Mitchell Tretter
Michael Adrian Battle
Niall Diarmuid O'Murchadha
Schlam, Stone & Dolan
26 Broadway
New York, NY 10004
212-344-5400

Glenn Michael Jones
48 Wall Street
11th Floor
New York, NY 10005
866-683-3774

**Defendants**

**John Does 1-5**
*(identities not presently known but intended to be owners and/or principals of either Academy O&P Associates or Academy Orthotic and Prosthetic Associates IPA, Inc.)*

**Jeffrey M. Eilender**
**Michael Adrian Battle**
**Niall Diarmuid O'Murchadha**
Schlam, Stone & Dolan
26 Broadway
New York, NY 10004
212-344-5400

**Third-Party Defendants**

**Managed Health, Inc.,**
**Healthfirst PHSP, Inc.,**
**Healthfirst Insurance Company,**
**Inc.**

**Scott B. Klugman**
**Seth L. Levine**
Levine Lee LLP
666 Fifth Avenue
New York, NY 10103
212-223-4400

**Third-Party Defendant**

**David P Thomas**

**Joshua D. Smith**
**Matthew Thomas Feinman**
**Max Saulter Gershenoff**
Rivkin Radler LLP
926 RXR Plaza
Uniondale, NY 11556
516-357-3000

**JACK B. WEINSTEIN, Senior United States District Judge:**

## Table of Contents

I.   Introduction ............................................................................................................... 2

   A.   Overview ............................................................................................................ 2

   B.   Subject Matter Jurisdiction ............................................................................... 4

II.   Factual Allegations ...................................................................................................... 4

   A.   Parties ................................................................................................................. 4

      1.   Plaintiff ........................................................................................................ 4

      2.   Academy Defendants .................................................................................... 5

      3.   Individual Defendants ................................................................................... 6

      4.   Third-Party Defendants Healthfirst and David P. Thomas ........................... 7

   B.   Contractual History between Fidelis and Academy ........................................... 8

      1.   1995 and 1998 Agreements between Fidelis and Academy Orthotics and Prosthetics ... 8

      2.   2014 Agreement between Fidelis and Academy O&P Associates ................. 8

      3.   Fidelis' Termination of 2014 Agreement .................................................... 10

   C.   Plaintiff's Allegations ...................................................................................... 12

      1.   Fraudulent Scheme ..................................................................................... 12

      2.   Declaratory Judgment ................................................................................. 13

      3.   RICO Claims ............................................................................................... 14

      4.   Common Law Fraud .................................................................................... 15

      5.   Unjust Enrichment ...................................................................................... 15

   D.   Defendants' Counterclaims and Third-Party Claims ....................................... 16

      1.   Fidelis Knew that Academy Always Acted as an IPA ................................ 16

      2.   Breach of Contract ...................................................................................... 18

      3.   Tort Claims .................................................................................................. 19

      4.   Declaratory Judgment ................................................................................. 20

      5.   Voluntary Dismissal of New York Public Health Law Claim ..................... 20

III.   Procedural History ..................................................................................................... 20

   A.   Motions to Dismiss .......................................................................................... 20

   B.   Defendants' Motion to Dismiss ....................................................................... 22

      1.   Claim is for Contract Breach, not Fraud .................................................... 22

      2.   RICO Violation Not Plead .......................................................................... 24

    3.    Particularity Requirements of Rule 9(b) ........................................ 26

    4.    Remaining State Law Claims ........................................................ 27

    5.    Damages ........................................................................................ 27

    6.    Request to Amend Complaint ...................................................... 27

IV.    Standard .................................................................................................. 27

  A.    Rule 12(b)(6) Failure to State a Claim ............................................... 27

  B.    Rule 12(b)(1) Lack of Subject Matter Jurisdiction .......................... 29

  C.    Rule 12(c) Judgment on Pleadings .................................................... 29

V.    Law ......................................................................................................... 30

  A.    RICO ................................................................................................... 30

    1.    Racketeering Activity Pattern ..................................................... 31

    2.    Wire Fraud as "Racketeering Activity" ...................................... 33

    3.    Rule 9(b) Particularity Requirement .......................................... 37

    4.    Wire Fraud vs. Breach of Contract ............................................. 39

    5.    Conspiracy .................................................................................... 40

VI.    Application of Law to Facts ................................................................... 40

  A.    Plaintiff Failed to Plead RICO Violation .......................................... 40

    1.    Dispute Contractual .................................................................... 40

    2.    Predicate Acts Not Pled ............................................................... 42

    3.    Conspiracy Claim Fails ............................................................... 47

VII.    State Claims: Supplemental Jurisdiction Denied ................................ 47

VIII.    Leave to Amend Denied ........................................................................ 48

IX.    Counterclaims and Third-Party Claims Dismissed ............................. 48

X.    Conclusion ............................................................................................. 48

## I.    Introduction

### A.    Overview

Plaintiff relies upon the weak crutch of the Racketeer Influenced and Corrupt Organizations Act ("RICO") to support a federal civil claim. The RICO statute does not encourage use of the criminal law with treble damages to decide contractual disputes among lawful

businesses.  There is no support for federal subject matter jurisdiction or a reason to retain state contract claims in this court.  The case is dismissed.

Plaintiff New York Catholic Health Plan, doing business as Fidelis ("plaintiff" or "Fidelis"), filed a complaint against defendants Academy O&P Associates, Academy Orthotic and Prosthetic Associates IPA, Inc. ("Academy"), Isaac Stein, John Callaghan, Harry Daskel and John Does "1" through "5" on June 5, 2015.  *See* Compl., June 5, 2015, ECF No. 1 ("Compl.").

Fidelis alleges that defendants submitted false claims indicating that Academy was the actual provider of durable medical equipment to Fidelis' clients when, unbeknownst to plaintiff, Academy was acting as an Independent Practice Association ("IPA"):  It was utilizing third-parties within its own network to directly provide the equipment to plaintiff's enrollees.  The claim is that plaintiff was injured as a result of the alleged fraudulent scheme; the third-party suppliers were providers that plaintiff would either not have contracted with, or would have contracted with at a lower rate than it did with Academy.  There is no dispute between the parties that Fidelis' enrollees actually needed and received the proper medical equipment.

The claims are cast under RICO, as well as common law fraud and unjust enrichment.  The sole basis for this court's subject matter jurisdiction is plaintiff's allegation of RICO violations.  There is no diversity between the parties, and no additional federal claims are being raised.

Together with their answer, defendants asserted counterclaims against Fidelis, as well as third-party claims against David P. Thomas and Healthfirst-related entities—another managed care organization with which Academy contracted for the provision of durable medical equipment.  Defendants allege that both Fidelis and Healthfirst knew that Academy was acting as an IPA when the two entities unlawfully terminated their separate contracts with Academy.  Defendants argue

that the termination was in retaliation for Academy's "whistleblowing," which triggered investigations by the United States Attorney's Office for the Eastern District of New York.

Defendants bring breach of contract and tort claims against Fidelis, Healthfirst and individual defendant Thomas. According to Academy, if the court accepts jurisdiction based on plaintiff's RICO claims, then it has supplemental jurisdiction over its state claims against Fidelis, Healthfirst and Thomas.

### B. Subject Matter Jurisdiction

Defendants have moved to dismiss pursuant to Federal Rules of Civil Procedure 9(b), 12(b)(1) and 12(b)(6), or for a judgment on the pleadings pursuant to Rule 12(c). They argue that the court lacks subject matter jurisdiction because plaintiff failed to plead—and cannot prove—a RICO claim, and that this is only a breach of contract dispute.

Defendants' well-founded motion to dismiss for failure to state a RICO claim is dispositive. The case is dismissed for lack of subject matter jurisdiction.

## II. Factual Allegations

### A. Parties

#### 1. Plaintiff

Plaintiff brought this action on June 5, 2015 against defendants Academy O&P Associates and Academy Orthotic and Prosthetic Associates IPA, Inc., as well as Isaac Stein, John Callaghan, Harry Daskel and John Does "1" through "5." *See* Compl.

Plaintiff is a not-for-profit corporation organized under New York State law with its principal place of business at 95-25 Queens Boulevard, Rego Park, New York 11374. *Id*. at ¶ 9. It provides free or low cost health insurance, including Medicaid and Medicare. *Id*. at ¶ 10.

Fidelis evaluates and selects types of providers to participate in its network and help it meet the healthcare needs of its enrollees. The providers include suppliers of durable medical equipment—"medical equipment that can withstand repeated use, and primarily consists of items that are used for medical purposes by individuals in their homes . . . ." *Id*. at ¶ 20. Included are orthotic and prosthetic devices—i.e., instruments "applied to the human body to align, support, or correct deformities, or to improve the movement of joints, spine, or limbs." *Id*.

As a "Prepaid Health Services Plan" ("PHSP"), Fidelis "accepts 'risk' while providing quality, affordable, health insurance for people of all ages and . . . stages of life based on payments that are received from government based programs." *Id*. at ¶ 28. It sponsors managed care health plans. *Id*.

### 2. Academy Defendants

The identity of the Academy defendants is disputed. According to plaintiff there are three separate Academy entities:

**Academy Orthotic and Prosthetic Associates IPA, Inc**. ("Academy IPA"): Academy IPA is an entity formed in September 2011 and incorporated in New York, with its principal place of business in New Jersey. *See id*. at ¶ 12. Despite its name, plaintiff argues that defendant Academy IPA never was an IPA that contracted with Fidelis to supply durable medical equipment to enrollees through third-party providers. *Id.*

**Academy Orthotic & Prosthetics Associates, Inc**.: This entity is the predecessor to Academy IPA. "Academy IPA was, prior to September 27, 2011, known as Academy Orthotic & Prosthetic Associates, Inc. and originally was incorporated in New York in 1994." *Id*. Plaintiff alleges that Academy has been in plaintiff's network since 1995, directly providing supplies— including durable medical equipment—to Fidelis' enrollees. It argues that "Academy has never

had an IPA agreement with Fidelis, or any other form of agreement that would allow . . . it to submit bills to Fidelis for [s]upplies that have been dispensed to [e]nrollees by providers other than Academy itself." *Id*. at ¶¶ 32-33.

**Academy O&P Associates**:  Plaintiff contends that defendant Academy O&P Associates is a New York sole proprietorship with its principal place of business in New Jersey.  *Id*. at ¶ 11.

Defendants counter that there was a single Academy entity at all times:  first, Academy Orthotic & Prosthetics Associates, Inc., which then changed its name to Academy IPA in September 2011.  *See* Answer to Compl., Third-Party Compl. and Countercl., July 20, 2015, ECF No. 39 ("Answer" "Third-Party Compl." or "Countercl." as appropriate), at Answer, n.1. According to defendants, both entities always acted as an IPA—indirectly providing supplies to Fidelis' enrollees through a network of third-party providers—rather than as a direct provider of supplies.  Defendants contend that the reference in the Standard Ancillary Services Agreement 2.0 (the "2014 Fidelis Agreement") to a sole proprietorship named "Academy O&P Associates" was a mistake or a "misnomer"—the real party to the 2014 Fidelis Agreement was Academy IPA and no separate "sole proprietorship" by the name of Academy exists.  *See id*.; *see also* Def. Mem. of Law in Opp'n to Pl. Mot. to Dismiss, Oct. 26, 2015, ECF 80-1 ("Def. Opp'n Mem."), at 12.

### 3.    Individual Defendants

Plaintiff names as defendants the following individuals:

**Isaac Stein**, a New York citizen.  Stein is alleged to have "owned, operated, managed and controlled Academy and Academy IPA and is currently an officer of Academy IPA."  Compl. at ¶ 13.

**Harry Daskel**, a New Jersey citizen. Daskel is alleged to have "owned, operated, managed and controlled Academy and Academy IPA and is currently an officer of Academy IPA." *Id*. at ¶ 15.

**John Callaghan**. *Id*. at ¶ 14. Upon the parties' stipulation, the claim against Callaghan was dismissed. *See* Order, Sept. 17, 2015, ECF No. 71.

**John Does 1 through 5**, citizens of New York. These are "individuals and entities, presently not identifiable, who have owned, operated, managed, and controlled Academy and/or Academy IPA in conjunction with Stein, Callaghan, and Daskel." Compl. at ¶ 16.

### 4. Third-Party Defendants Healthfirst and David P. Thomas

On July 20, 2015, together with their answer, defendants filed a third-party complaint against Healthfirst-related defendants and David P. Thomas. *See generally* Third-Party Compl.

Healthfirst PHSP, Inc., Managed Health, Inc., and Healthfirst Insurance Company, Inc. (together "Healthfirst") are, according to defendants, "non-for-profit corporations affiliated with each other, organized under the laws of the State of New York, which market themselves collectively under the name 'Healthfirst,' with a principal place of business at 100 Church Street, New York, New York." *Id*. at ¶ 22. Allegedly, like Fidelis, Healthfirst is a managed care organization with which Academy contracted for durable medical equipment. *See id*. at ¶ 5.

David P. Thomas, according to defendants, was employed by Fidelis and currently serves as its Executive Vice-President and Chief Operating Officer. He is a resident of New York. *See id*. at ¶ 21.

### B. Contractual History between Fidelis and Academy

#### 1. 1995 and 1998 Agreements between Fidelis and Academy Orthotics and Prosthetics

Academy and Fidelis have been in a contractual relationship for approximately 20 years. Fidelis and Academy Orthotics and Prosthetics, a "corporation authorized to do business pursuant to the laws of New York State" first entered into a "General Provider Agreement" on June 16, 1995. *See* Countercl. at Ex. 1. This agreement was then superseded by an "Ancillary Services Agreement" entered into between Fidelis and "Academy Orthotics and Prosthetic Associates," a "corporation organized under the laws of New York State" on March 31, 1998. *See id*. at Ex. 2.

Plaintiff claims that "[s]ince 1995, Academy has been a signatory to a series of agreements with Fidelis and its various predecessors pursuant to which it has been enrolled in the Fidelis network of providers. As a byproduct of that relationship, Academy has agreed for almost 20 years to accept a percentage of the New York State Medicaid and/or Medicare fee schedule as full payment for [s]upplies that it provides to [e]nrollees." Compl. at ¶ 32. Plaintiff alleges that over the course of this relationship, Academy always contracted with Fidelis as a direct provider of medical supplies, and never as an IPA. *Id*. at ¶ 33. Due to its longstanding relationship with Fidelis, plaintiff argues, "Academy has been able to maintain favorable pricing despite an extremely competitive marketplace . . . as compared with other supply companies that are party to agreements with Fidelis and participate in the network." *Id*. at ¶ 34.

#### 2. 2014 Agreement between Fidelis and Academy O&P Associates

On November 1, 2014, Fidelis and an entity named "Academy O & P Associates," described in the contract as "a sole proprietor duly licensed to practice pursuant to the laws of New York State," entered into the 2014 Fidelis Agreement. Countercl. at ¶ 57 and Ex. 10. This contract was to replace the existing 1998 agreement between Fidelis and "Academy Orthotic and Prosthetic

Associates," "a corporation organized under the laws of New York State."  *See id*. at ¶ 50 and Ex. 2.

The 2014 Fidelis Agreement refers to "Academy O & P Associates" as a "Provider."  *See id*. at Ex. 10.  The Agreement defines "Plan Provider":

> "**Plan Provider**" shall mean a licensed or certified health care professional, professional organization, institution or independent practice association that contracts with Plan to provide or arrange for the provision of Health Care Services to Enrollees.

*Id*. at § 1.12.

The Agreement defines "Personnel":

> "**Personnel**" shall mean physicians, nurses, other appropriate health care professionals and technical personnel who are employees on Provider's staff or are independent contractors of provider.

*Id*. at § 1.10.

Annexed to the 2014 Fidelis Agreement are the March 1, 2011 New York State Department of Health Standard Clauses for Managed Care Provider/IPA Contracts (the "Standard Clauses").  *See id*. at App. A.  The Standard Clauses include the following definitions of "Independent Practice Association" and "Provider:"

> "Independent Practice Association" or "IPA" shall mean an entity formed for the limited purpose of arranging by contract for the delivery or provision of health services by individuals, entities and facilities licensed or certified to practice medicine and other health professions, and, as appropriate, ancillary medical services and equipment, by which arrangements such health care providers and suppliers will provide their services in accordance with and for such compensation as may be established by a contract between such entity and one or more [managed care organizations].  "IPA" may also include, for purposes of this Agreement, a pharmacy or laboratory with the legal authority to contract with other pharmacies or laboratories to arrange for or provide services to enrollees of a New York State [managed care organization].

> "Provider" shall mean physicians, dentists, nurses, pharmacists and other health care professionals, pharmacies, hospitals and other

entities engaged in the delivery of health care services which are licensed, registered and/or certified as required by applicable federal and state law.

*Id*.

On December 12, 2014, Harry Daskal from Academy IPA sent an email to Elizabeth J. Flanigan, Contract Management Representative at Fidelis, under the subject "re: Academy IPA." The text states:

> Just to clarify our conversation Academy IPA does not need to convert to an IPA agreement under Fidelis at this time. As we discussed your AVP John Place will not convert any contracts to an IPA's. The agreement we executed back in September 2014 will remain as is until Fidelis wishes to convert Academy IPA to [an] IPA agreement. Please confirm if I understand correctly so I can let my boss know that it's fine th[e] way it is for now.

*Id*. at Ex. 9.

Later that day, Ms. Flanigan responded, stating: "This is correct and yes I did verify with John Place that Fidelis will not be executing any new IPA agreements at this time." *Id*.

### 3.    Fidelis' Termination of 2014 Agreement

On January 28, 2015, Fidelis sent Academy a "Notice of Material Breach" letter threatening litigation. The letter reads:

> This letter will serve as notice that Academy Orthotics O & P (Academy) is in material breach of its agreement with Fidelis Care New York (Fidelis). Fidelis has determined that Academy is acting as an "independent practice association" (IPA) in violation of the ancillary services agreement, "Agreement", executed between Fidelis and Academy dated September 11, 2014.
>
> […]
>
> As Fidelis has identified that Academy is acting in violation of Section 2 of the "Agreement" Fidelis is notifying Academy that it has 60 days to cure. Fidelis is placing Academy on notice that it believes Fidelis has paid claims to uncredentialed providers and that

as a result an overpayment has occurred. Fidelis is not waiving its right to seek recovery on any overpayment identified.

Fidelis considers the use of uncredentialed providers to be a very serious matter and it intends to pursue such actions vigorously. . . . If we do not hear from you we will pursue all available remedies to recover these overpayments.

*Id.* at Ex. 21. According to Fidelis, Academy had breached section 2.2.4 of the 2014 Fidelis

Agreement by allowing third-parties that had not been previously approved by Fidelis to supply

equipment to Fidelis' enrollees. Section 2.2.4 of the Agreement provides:

Nothing in this Section 2.2.4 is intended, nor shall be construed, to mean that Plan has delegated to Provider Plan's responsibility or right to credential Personnel through Plan's credentialing process. Provider and Plan understand and agree that all Personnel must be credentialed and approved by Plan prior to rendering Ancillary Services to Enrollees.

*Id.* at Ex. 10, § 2.2.4.

In February 2015, Academy requested that the 2014 Agreement be amended to replace

"Academy O & P Associates" with "Academy Orthotics and Prosthetics Associates, Inc. IPA" and

"sole proprietorship" with "IPA." *See id.* at Ex. 22. Fidelis replied on February 23, 2015, by

reiterating its position that Academy was in material breach of the 2014 Agreement:

Quite clearly, a reading of the entire section 2.2.4 leaves no doubt that any services rendered to a Fidelis member must be done by a ***credentialed provider***. Moreover, Fidelis has not delegated the credentialing authority to your client under the Agreement. That right remains only with Fidelis.

In addition, Fidelis is aware that on several occasions, Mr. Harry Daskal of Academy has attempted to obtain an IPA agreement with Fidelis and each attempt was specifically declined by Fidelis. This is further proof that your client is aware that there is no IPA Agreement between the parties and is operating in breach of contract.

Fidelis has reviewed your proposed amendment and respectfully declines to exercise any amendment with your client at this time.

*Id.* (emphasis in original).

On June 5, 2015, Fidelis sent Academy a notice pursuant to section 8.3.2.1 that the Agreement was terminated effective immediately. *Id.*

### C. Plaintiff's Allegations

#### 1. Fraudulent Scheme

Plaintiff alleges that Academy engaged in a fraudulent scheme: it submitted false claims to Fidelis indicating that it was the actual provider of durable medical equipment when, unbeknownst to Fidelis, Academy was acting as an IPA and providing the requested supplies through its network of third-party providers.

According to plaintiff, it never contracted with defendant Academy "in any capacity other than as a <u>direct</u> provider of Supplies to Fidelis' Enrollees." Compl. at ¶ 33 (emphasis in original). "Academy has never had an IPA agreement with Fidelis, or any other form of agreement that would allow for it to submit bills to Fidelis for Supplies that have been dispensed to Enrollees by providers other than Academy itself." *Id.*

It is alleged that, despite the fact that Academy IPA was formed in September 2011, *see* Countercl. at Exs. 6-7, the individual defendants did not identify the existence of the IPA and, in November 2014, re-contracted with Fidelis in the name of Academy only. *See* Compl. at ¶¶ 36-37. Shortly after the formation of Academy IPA in 2011, plaintiff argues, the defendants "began to market Academy IPA to other providers, including the Third-Party Providers" and offering incentives to third-party providers to join the IPA. *Id.* at ¶ 38.

Plaintiff contends that, in exchange for a commitment by the third-party providers to pay defendants a percentage of revenue received from Fidelis, defendants gave providers that were either not part of Fidelis' network or had less economically advantageous contracts with Fidelis

the "ability to bill and collect from Fidelis under the Academy contract and at the higher Academy rate." *Id.* at ¶ 39; *see also* Hr'g Tr., Dec. 15, 2015 (alleging that defendants sold access to the Fidelis network in exchange for a higher reimbursement rate). In furtherance of this fraudulent scheme, plaintiff argues, defendants submitted claims to Fidelis solely in Academy's name, for supplies provided by third-parties. *See* Compl. at ¶¶ 21-23, 39-40. Fidelis claims that some of the third-party providers that participated in this scheme had been specifically rejected by it. *Id.* at ¶¶ 47-49 ("several of [the third-party providers] had previously been the subject of affirmative lawsuits alleging fraud in connection with the submission of durable medical equipment claims under the New York no-fault insurance system").

Fidelis contends that defendants took advantage of their knowledge of its claims processing practice in order to perpetuate the fraudulent scheme. *See id.* at ¶¶ 41-42; *see also* Hr'g Tr., Dec. 15, 2015. According to plaintiff, defendants purposely concealed their fraud by intentionally omitting the National Provider Identification ("NPI") numbers of the actual third-party providers from their claims submissions, and plaintiff relied on defendants' representations. *See* Compl. at ¶¶ 42, 51-53. Fidelis became aware of defendants' alleged scheme in early 2015, after an "uncharacteristic spike" in Academy's billing prompted it to begin investigating Academy through its Special Investigations Unit. *Id.* at ¶¶ 45-46.

Plaintiff seeks damages in excess of $9,000,000.00 based upon allegedly fraudulent charges submitted by defendants. *Id.* at ¶ 52.

### 2.    Declaratory Judgment

Plaintiff claims that, based on the fraud allegations, "[t]here is an actual case in controversy between Fidelis and Academy regarding more than $9,000,000.00 in fraudulent billing for supplies that allegedly have been provided to Fidelis' Enrollees." *Id.* at ¶ 55. It requests a declaratory

judgment, 28 U.S.C. §§ 2201 and 2202, finding that, due to defendants' fraudulent scheme, Academy has no right to receive payment on any pending bills. *Id.* at ¶ 57.

### 3. RICO Claims

Plaintiff asserts RICO claims under 18 U.S.C. §§ 1962(c) and (d) against the individual defendants. *See id.* at ¶¶ 58-71. Specifically, plaintiff alleges that Academy O&P Associates and Academy IPA together amount to an association-in-fact enterprise, as defined in 18 U.S.C. § 1941(4), whose "business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to Fidelis." *Id.* at ¶¶ 59, 63. According to plaintiff:

> Academy [O&P Associates] was created and used to obtain access to Fidelis' Enrollees and its restricted network, and to serve as the conduit through which fraudulent billing could be submitted to Fidelis. Academy IPA was created and used to sell access to Enrollees and Fidelis' restricted network to the Third-Party Companies, while simultaneously concealing the sale of access to Enrollees and Fidelis' restricted network to the Third-Party Companies.

*Id.* at ¶ 60.

The individual defendants, plaintiff argues, participated in the affairs of the Academy Enterprise "through a pattern of racketeering activity consisting of repeated violations of the federal . . . wire fraud statute, 18 U.S.C. § 1343, based upon the use of the wires in interstate commerce to submit or cause to be submitted thousands of fraudulent bills on a continuous basis for more than three years." *Id.* at ¶ 62. The parties have stipulated to withdraw all references to "mail fraud" from plaintiff's complaint. *See* Stipulation and Order, Oct. 29, 2015, ECF No. 86 (granting the parties' stipulation).

Injury to business and property is claimed because Fidelis argues it has "paid at least $9,000,000.00 pursuant to the fraudulent bills submitted by Academy." *Id.* at ¶ 64. Plaintiff seeks

treble damages, costs and reasonable attorneys' fees.  *See* 18 U.S.C. § 1964(c); Compl. at ¶¶ 65, 71.

### 4.    Common Law Fraud

Fidelis claims that defendants "intentionally and knowingly made false and fraudulent statements of material fact to [it] and concealed material facts from [it] in the course of their submissions of thousands of fraudulent charges seeking payment for durable medical equipment and orthotic devices."  Compl. at ¶ 73.  The false and fraudulent statements related to: (1) the representation that Academy was the provider of the supplies, when in fact the supplies were being provided by third parties; and (2) the concealment of Academy's "kickback" scheme with the third-party providers.  *Id.* at ¶¶ 74-75 ("The Defendants made false and fraudulent statements and concealed material facts in a calculated effort to induce Fidelis to pay charges that were not compensable and to allow Defendants to realize money in the form of a percentage of the money paid by Fidelis on the fraudulent claims.").

Argued by plaintiff is that it justifiably relied on the defendants' misrepresentations and, as a proximate result, suffered more than $9,000,000.00 in damages.  *Id.* at ¶ 76.  It seeks compensatory and punitive damages, as well as interests and costs.  *Id.* at ¶ 78.

### 5.    Unjust Enrichment

Plaintiff claims defendants were unjustly enriched by virtue of the payments they obtained from Fidelis as a result of their fraudulent scheme.  *Id.* at ¶¶ 79-84.

**D.      Defendants' Counterclaims and Third-Party Claims**

**1.      Fidelis Knew that Academy Always Acted as an IPA**

Defendants argue that plaintiff always knew Academy was acting as an IPA—that is, as a network of smaller third-party providers—and not as a direct provider of the supplies in question. *See generally* Countercl.  According to defendants "[s]mall [durable medical equipment] providers do not have the resources to do the necessary billing and collection themselves and so they contract with IPAs to perform these services for a small fee.  Consistent with that practice, Academy IPA billed Fidelis for the actual expense of the durable medical equipment provided by its members, and Academy IPA charged a small fee for its networking services."  *Id*. at ¶ 1; *see also* Hr'g Tr., Dec. 15, 2015.

Defendants explain that Academy IPA formally converted to an IPA in September 2011, in order to comply with New York State regulations promulgated in 2008 requiring that third-party provider networks such as itself be recognized by New York State as IPAs.  Countercl. at ¶¶ 3, 40-42 and Exs. 6-7.  Yet, even prior to the formal conversion to an IPA, Academy had always been acting as a network of third-party providers.  *See id*. at ¶ 4.

Defendants state that the fact that Academy IPA performed as an IPA was known to plaintiff, as demonstrated by several documents, including:  (1) the 2014 Fidelis Agreement, which included "independent practice association" in its definition of "Plan Provider," *id*. at Ex. 10, § 1.12; (2) several emails and other written communications exchanged between the parties prior to the 2011 formal name change, *see, e.g.*, *id*. at Exs. 3-5, as well as after, *see, e.g.*, *id*. at Exs. 12-14, which disclosed the existence of third-party suppliers as well as the list of Academy's "Patient Care Centers"; and (3) the HCFA 1500 insurance claim forms themselves, since these identified the name and location of the specific service suppliers and listed Academy only as the "billing provider."  *See id*. at Ex. 15; *see also id*. at ¶¶ 3-7, 45-69.

Academy IPA sought to finalize a formal IPA agreement with Fidelis in 2014, to replace the provider agreement under which the parties were operating. According to defendants, they were told by a plaintiff representative that "Fidelis was not entering into any more formal IPA agreements, but that it fully understood that Academy IPA was an IPA and that the Provider Agreement that they would be entering into would permit [the defendant] to function as an IPA." *Id*. at ¶ 54; *see also id*. at Ex. 9; *supra* at 10.

Defendants argue that both plaintiff and Healthfirst terminated their agreements with Academy "on the false and pre-textual [*sic*] basis that [they] supposedly never knew that Academy IPA was an IPA." Countercl. at ¶ 5. According to defendants, termination of the agreements, as well as prosecution of the present suit, are actions carried out in retaliation for Academy's "whistleblowing." *Id*. at ¶¶ 9-11. In 2013, Academy IPA became aware of potentially illegal overcharging by some of its own providers, supplying services to Healthfirst. Academy IPA informed Healthfirst and asked it to conduct an audit of Academy IPA, to ensure there were no other billing irregularities. Academy IPA's complaint triggered a statutory obligation of Healthfirst to report itself to the federal government. As a result, Healthfirst was investigated by the United States Attorney for the Eastern District of New York. *Id*. at ¶ 9. Academy IPA was subpoenaed as a witness. Academy IPA also reported that the same kind of miscoding had occurred with Fidelis enrollees. As a result, the investigation focused on Fidelis as well as Healthfirst. *Id*. at ¶ 10. Around the time of the investigations, defendants argue, both Fidelis and Healthfirst terminated their agreements with Academy IPA.

Defendants also contend that Fidelis and Healthfirst decided to eliminate Academy IPA as the main competitor to Integra—another network of small durable medical equipment providers with which both Fidelis and Healthfirst contract. According to defendants, the providers in the

Integra network also overbilled, and it, too, was investigated. *Id*. at ¶¶ 12-15. In sum, "[t]he Academy Defendants believe that Integra is recompensing Fidelis and Healthfirst for overbilling them by giving them [a] significant discount [on Medicare and Medicaid reimbursements for durable medical equipment], and that Integra, Healthfirst and Fidelis have agreed that the two [managed care providers] will eliminate Academy IPA as a competitor to Integra." *Id*. at ¶ 15.

### 2.        Breach of Contract

Defendants submit that the 2014 Fidelis Agreement expressly permitted Academy IPA to provide services as an IPA (by billing Fidelis for equipment provided by third-party suppliers in its network of providers). Specifically: (1) although the Agreement referred to Academy IPA as a "Provider," it defined "Plan Provider" to include an "independent practice association;" (2) the Agreement provides that all "ancillary services," such as the supply of durable medical equipment, shall be provided by either the "Provider" or "Personnel" of the provider, which comprises independent contractors of the provider. According to Academy, independent contractors include its network of third-party suppliers; and (3) Academy IPA fell within the definition of IPA contained in the Standard Clauses, which were incorporated into the Agreement. Under these definitions, Academy IPA qualifies as an IPA rather than a provider—thus the contract must be understood as one between a managed care organization and an IPA. *See id*. at ¶¶ 57, 59, 63 and Exs. 10, 11.

According to Fidelis, the Standard Clauses are included in their entirety in any agreement between a managed care organization and either a provider or an IPA and therefore cannot transform the nature of the contract from one with a provider to one with an IPA. *See* Pl.'s Mem. in Opp'n to Mot. to Dismiss, Oct. 23, 2015, ECF No. 74 ("Pl.'s Opp'n Mem.") at 5-6. Defendants counter that the definitions in the Standard Clauses are controlling, since the Agreement itself

specifies they are binding on the parties and that they "shall prevail" in the event of "any inconsistency or contrary language" in other parts of the Agreement. *See* Defs.' Reply in Supp. of Mot. to Dismiss, Nov. 16, 2015, ECF No. 92 ("Defs.' Reply Mem.") at 13-14.

Defendants argue that the 2014 Fidelis Agreement specifies the conditions under which plaintiff could terminate the contract, none of which is present in this case. According to defendants, Academy IPA fulfilled its material obligations under the Agreement. But plaintiff "materially breached the Agreement by wrongfully terminating Academy IPA for pretextual reasons that Fidelis knew to be false." Countercl. at ¶¶ 108-109.

Defendants similarly claim that third-party defendant Healthfirst materially breached the 2014 Healthfirst Agreement by wrongfully terminating Academy IPA for pretextual reasons. Healthfirst knew the reasons given to be false. *Id*. at ¶ 120.

### 3.        Tort Claims

Defendants bring tortious interference with existing contract and with prospective business relations claims against plaintiff and third-party defendants. *Id*. at ¶¶ 124-131. They argue that these parties induced the breach of the provider agreements between Academy IPA and its third-party network suppliers. *Id*. at ¶ 128 ("As a result of the unlawful termination of the Fidelis and Healthfirst agreements, [durable medical equipment] providers terminated their membership in the Academy IPA network. Thus, the termination of the Fidelis and Healthfirst agreements, as intended, resulted in the terminations down the chain of agreements between the Academy IPA and its members.").

Defendants also claim that both plaintiff and the third-party defendants committed a *prima facie* tort causing special damages: "[a]ssuming . . . [that] Counterclaim and Third-Party Defendants had [no] financial motivation to harm Academy IPA . . . termination of the Fidelis and

Healthfirst agreements with Academy IPA and the filing of this sham lawsuit [were] solely out of spite." *Id*. at ¶ 147.

### 4. Declaratory Judgment

Defendants seek "a judicial declaration as to their rights and obligations." *Id*. at ¶¶ 151-154.

### 5. Voluntary Dismissal of New York Public Health Law Claim

On October 23, 2015, defendants entered a notice of voluntary dismissal of their fourth cause of action—that plaintiff and Healthfirst violated New York Public Health Law. *See* Notice of Voluntary Dismissal, Oct. 23, 2015, ECF No. 76. The voluntary dismissal was approved by the court on October 29, 2015. *See* Endorsed Order, Oct. 29, 2015, ECF No. 87.

## III. Procedural History

### A. Motions to Dismiss

By separate motions, all parties seek dismissal on the pleadings.

**Defendants' motion to dismiss plaintiff's complaint**: Defendants argue that the court lacks subject matter jurisdiction because the claims are primarily for a breach of contract—based on whether or not Academy could bill Fidelis as an IPA during the 2012-2015 period. This theory cannot be transformed into a fraud allegation sufficient to sustain a civil RICO action.

Defendants also argue that plaintiff has not made out the necessary elements of a RICO claim: (1) plaintiff has not identified an "association-in-fact," since it alleges that Academy IPA associated with the "Academy sole proprietorship" identified in the 2014 Fidelis Agreement, but such an entity does not actually exist; (2) plaintiff has not identified the necessary predicate acts, since Academy has always disclosed its status as an IPA as well as the identity of its providers;

and (3) plaintiff has failed to plead a pattern of racketeering activity, as plaintiff alleges predicate acts of wire fraud only, by at most two participants, against a single victim and carried out through a single scheme.

**Plaintiff Fidelis' and third-party plaintiff Thomas' motion to dismiss defendants' counterclaims and third-party claims**: Plaintiff seeks dismissal of defendants' counterclaims and third-party claims arguing that defendant was in material breach of the 2014 Fidelis Agreement and plaintiff had the right to terminate the Agreement. According to plaintiff, defendants' remaining tort law claims are contingent on the breach of contract claim and are, in any event, without merit.

**Third party defendant Healthfirst's motion to dismiss defendants' third-party complaint and alternative motion for severance**: Healthfirst's motion for dismissal is similar to that submitted by plaintiff Fidelis. According to Healthfirst, it had the contractual right to terminate the 2014 Healthfirst Agreement because of Academy's material breach; the remaining tort law claims are contingent on the breach of contract claim and without merit as a basis for federal jurisdiction. With respect to severance, Healthfirst argues that it was improperly joined since the third-party complaint does not establish any jointly undertaken activity by Healthfirst and Fidelis.

**Third party defendant Healthfirst's motion to dismiss defendants' third-party complaint for lack of subject matter jurisdiction**: Healthfirst also moved separately to dismiss for lack of subject matter jurisdiction, arguing that the court should not exercise supplemental jurisdiction over the state law claims brought against it by Academy.

### B.  Defendants' Motion to Dismiss

On September 25, 2015, defendants filed a motion to dismiss plaintiff's complaint pursuant to Federal Rules of Civil Procedure 9(b) (particularity requirement for pleading fraud); 12(b)(1) (lack of subject matter jurisdiction); 12(b)(6) (failure to state a claim); and/or 12(c) (judgment on the pleadings).  *See* Defs.' Mem. in Supp. of Mot. to Dismiss, Sept. 25, 2015, ECF No. 66 ("Defs.' Mem.").  Plaintiff filed its memorandum in opposition on October 23, 2015.  *See* Pl.'s Opp'n Mem. Defendants filed a reply memorandum on November 16, 2015.  *See* Defs.' Reply Mem.

A hearing on all motions was conducted on December 15, 2015.  No information or claims other than that previously provided by the parties in their submitted papers was supplied.  *See* Hr'g Tr., Dec. 15, 2015.

Defendant's motion to dismiss plaintiff's complaint on the ground of a failure to state a RICO claim is dispositive of the litigation as a federal case.  It is unnecessary to address the merits of any other pending motions except to note that all of the other claims are also dismissed without prejudice for lack of subject matter jurisdiction.

### 1.  Claim is for Contract Breach, not Fraud

Defendants contend that plaintiff's main assertions—that Academy misrepresented that it was a provider and concealed the true identity of the actual providers of durable medical equipment—are false.  According to defendants, it was customary for the IPA rather than the provider to be identified as the "Billing Provider" on the claims, and the electronic claims transmissions to Fidelis identify a provider other than Academy as the "Service Facility."  *See* Defs.' Mem. at 17-18; *see also* Countercl. at Ex. 15; Hr'g Tr., Dec. 15, 2015.  Defendants note that there is no question that Fidelis' enrollees actually received the proper equipment and that it was medically necessary and satisfactory.  There is thus no merit, it is argued, to plaintiff's claim

that it is entitled to $9,000,000.00 (the full amount paid to Academy IPA from 2012 to 2015) in damages. *See* Defs.' Mem. at 2, 6.

Defendants insist that, because there is no fraud, plaintiff failed to plead a civil RICO case—the sole basis for federal jurisdiction. *See id*. at 1-3; *see also* Hr'g Tr., Dec. 15, 2015. According to defendants, plaintiff is essentially asserting a breach of contract claim—based on whether or not Academy could bill Fidelis as an IPA during the 2012-2015 period—and this contention cannot be transformed into a fraud claim sufficient to sustain a civil RICO action. *See* Defs.' Reply Mem. at 10-18. Defendants point to the fact that "in terminating the parties' relationship, Fidelis couched the issue as one of Academy IPA breaching the parties' agreement." *See* Defs.' Mem. at 16. In any event, defendants argue, the Agreement actually required Academy to act as an IPA. *See supra* Part II.D.2.

In response to defendants' motion to dismiss, plaintiff notes that the fraud claims it asserts in its complaint are collateral and extraneous to the contract. Plaintiff points to numerous invoices submitted by defendants, *see* Compl. at Ex. 1, which allegedly misrepresented that Academy O&P was the supplier of the durable medical equipment when in fact the suppliers were third parties. These third-parties either: (1) had not independently contracted with Fidelis to bill for supplies provided to enrollees; (2) had previously been rejected from the Fidelis network or the Medicaid/Medicare systems; or (3) had contracts with Fidelis which provided for lower reimbursement rates than Academy O&P had negotiated with Fidelis. Pl.'s Opp'n Mem at 13. The intentional misrepresentations were made, plaintiff argues, in order to induce Fidelis to pay claims it was not legally obligated to pay. *Id.*; *see also* Hr'g Tr., Dec. 15, 2015.

Fidelis argues that there never was a contract between Academy IPA and Fidelis, but only between Academy O&P—a distinct sole proprietorship—and Fidelis. Pl.'s Opp'n Mem at 13-14;

Hr'g Tr., Dec. 15, 2015. Academy O&P was, it is asserted, purposely used as a "front" to hide the fact that Academy IPA was acting as an IPA rather than as a direct provider. Pl.'s Opp'n Mem. at 13-14.

Plaintiff also argues that defendants had an independent legal duty to Fidelis to ensure that the claims submitted to federal health care programs were true and accurate. Fidelis argues that defendants routinely violated New York State Insurance Law Section 403 by submitting fraudulent billing exclusively under Academy O&P's name when in reality none of the supplies was being furnished by Academy O&P. *Id*. at 15.

### 2. RICO Violation Not Plead

According to defendants, plaintiff's RICO claim must fail:

- Plaintiff has not set forth any individual patterns of racketeering activity which any particular defendant engaged in. Instead, all plaintiff alleges are "collective activities." Defs.' Mem. at 19-20.

- There is no "association-in fact enterprise" since there is only one Academy entity—Academy IPA—and no separate "Academy sole proprietorship" exists. The only evidence of an alleged "Academy sole proprietorship" is the 2014 Fidelis Agreement. *Id*. at 20-21. Defendants argue that this was a mistake; there always was one single Academy entity, as demonstrated by the fact that it always used the same tax identification number in its contracts with Fidelis. *See* Defs.' Reply Mem. at 2-5; Hr'g Tr., Dec. 15, 2015.

- Plaintiff fails to allege the necessary predicate acts, since its claim rests solely on unsupported wire fraud allegations. Defendants allege that Academy IPA always disclosed its status as an IPA and the identity of its providers, and thus plaintiff cannot establish the existence of fraudulent intent. Defs.' Mem. at 21-23.

- Plaintiff has failed to plead a pattern of racketeering activity. Plaintiff failed to show closed-end continuity: "Fidelis has alleged predicate acts of wire fraud only, by at best two participants, against a single victim, involving no variety and involving at best a single scheme. Other than length, it lacks all of the elements required to find closed-ended continuity . . . ." *Id*. at 25. Plaintiff failed to demonstrate open-ended continuity: "[t]he Complaint states that Fidelis became aware of Academy IPA's status and stopped making payments to it in May 2015" and the nature of the alleged RICO enterprise was inherently lawful. *See id*. at 26.

- A "mere multiplicity of transmissions is insufficient to withstand the requisite particular scrutiny when a civil RICO claimant pleads no predicate acts other than wire fraud . . . ." *See* Defs.' Reply Mem. at 19; *see also* Defs.' Mem. at 21-23. Plaintiff's only allegations of misstatements—that Academy failed to disclose the NPI number of the actual provider of the supplies—are less probative than the ones relied upon in the cases plaintiff cites to in support of the sufficiency of its allegations. Defs.' Reply Mem. at 21-22.

Defendants also argue that plaintiffs fail to allege a RICO conspiracy, because: (1) plaintiff's substantive RICO claim is deficient; and (2) plaintiff fails to "allege facts suggesting 'a conscious agreement among all defendants to commit at least two predicate acts.'" *See* Defs.' Mem. at 27-28.

In response, plaintiff argues that:

- It has sufficiently pled the existence of an association-in-fact enterprise consisting of Academy O&P and Academy IPA: defendants erroneously contend that Academy O&P is not a separate legal entity, even though the 2014 Fidelis Agreement identifies it as a "sole proprietorship." Pl.'s Opp'n Mem. at 16-18.

- Fidelis sufficiently alleges that defendants repeatedly violated the federal wire fraud statute by "use of the wires in interstate commerce to submit or cause to be submitted thousands of fraudulent bills on a continuous basis for more than three years." *Id*. at 18. In support of this argument, plaintiff attached to its complaint a chart of more than 1,000 allegedly fraudulent claims. *See* Compl. at Ex. 1.

- Fidelis sufficiently pled a pattern of racketeering: (1) Fidelis sufficiently alleged closed-ended continuity by pointing to Academy's allegedly fraudulent charges wired over a period of three years that "caused multiple economic injuries"; and (2) Fidelis has alleged open-ended continuity because it "has alleged that the predicate acts of wire fraud are the regular way that the [d]efendants operated the Academy Enterprise, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to Fidelis," and defendants continue to attempt to collect on the allegedly fraudulent billing. Pl.'s Opp'n Mem. at 19-24.

Because it contends that the RICO claim is sufficiently pled, plaintiff argues that its RICO conspiracy claim should survive. *Id*. at 24-25.

### 3. Particularity Requirements of Rule 9(b)

Defendants argue that plaintiff's RICO claims fail since plaintiff has failed to plead its fraud allegations with the particularity required under Federal Rule of Civil Procedure 9(b). This includes failing to sufficiently plead facts giving rise to a "*strong* inference of fraudulent intent," as well as any individual defendant's role in the alleged fraud. *See* Defs.' Mem. at 29 (emphasis in original); *see also* Defs.' Reply Mem. at 27-28.

### 4.    Remaining State Law Claims

Defendant argues that plaintiff's remaining state law claims should be dismissed.  Once the RICO claims are dismissed, only state law claims remain and the court should decline to exercise supplemental jurisdiction.  *See* Defs.' Mem. at 30, 33-34.  Defendants also argue that such claims should be dismissed on the merits.  *See id.* at 30-33.

### 5.    Damages

Plaintiff challenges defendants' assertion that because the proper supplies were actually delivered to Fidelis' enrollees, then Fidelis did not suffer any cognizable damages.  *See, e.g.*, Defs.' Reply Mem. at 29 (stating that "Fidelis cannot accept full performance and yet refuse to pay Academy IPA anything simply because of a credentials issue").  According to Fidelis, because defendants misrepresented the identities of the actual medical equipment suppliers, Fidelis would either have not been obliged to pay the equipment claims at all or would been able to pay less. Pl.'s Opp'n Mem. at 28.

### 6.    Request to Amend Complaint

Finally, if the court finds any defect in its complaint, plaintiff requests leave to amend pursuant to Federal Rule of Civil Procedure 15(a).  Pl.'s Opp'n Mem. at 29.  Defendants oppose, arguing that plaintiff has not shown why any defects in its pleading are "merely technical" or how those defects could be cured.  Defs.' Reply Mem. at 28.

## IV.    Standard

### A.    Rule 12(b)(6) Failure to State a Claim

To withstand a Rule 12(b) motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (*quoting Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

On a motion to dismiss for failure to state a claim under Rule 12(b)(6), "a court must accept the plaintiff's factual allegations as true, drawing all reasonable inferences in plaintiff's favor." *Friedman v. Maspeth Fed. Loan & Sav. Ass'n*, 30 F. Supp. 3d 183, 188-89 (E.D.N.Y. 2014) (internal quotation marks and citation omitted); *Belfiore v. Procter & Gamble Co.*, 94 F. Supp. 3d 440, 446 (E.D.N.Y. 2015); *Smith v. City of New York*, No. 14-CV-4982, 2015 WL 4008642, at *2 (E.D.N.Y. June 30, 2015).

"[T]he issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Bell Atl. Corp.*, 550 U.S. at 583 (internal quotation marks and citation omitted). "[T]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009) (internal quotation marks and citation omitted). It is the "legal feasibility of the complaint," and not the weight of the evidence, that must be assessed. *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 113 (2d Cir. 2010); *Smith*, 2015 WL 4008642 at *2.

Whether a complaint states a plausible claim to relief "is a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *In re Amaranth Nat. Gas Commodities Litig.*, 730 F.3d 170, 180 (2d Cir. 2013) (citations omitted); *see also Davise v. Target Corp.*, No. 14-CV-420, 2014 WL 2602414, at *1 (E.D.N.Y. June 11, 2014).

In considering a motion pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint. *DiFolco*, 622 F.3d at 111; *Hayden v. Cty. of Nassau*, 180 F.3d 42, 54 (2d Cir. 1999). Where a document is not incorporated by reference, the court may consider it where the complaint "relies heavily upon its terms and effect," thereby rendering the

document "integral" to the complaint. *Mangiafico v. Blumenthal*, 471 F.3d 391, 398 (2d Cir. 2006) (internal quotations omitted); *DiFolco*, 622 F.3d at 111.

### B. Rule 12(b)(1) Lack of Subject Matter Jurisdiction

As with a Rule 12(b)(6) motion, all material factual allegations in the complaint are accepted as true when deciding a motion to dismiss for lack of subject matter jurisdiction pursuant to Rule 12(b)(1). *Shipping Fin. Servs. Corp. v. Drakos*, 140 F.3d 129, 131 (2d Cir. 1998). "The plaintiff bears the burden of proving by a preponderance of the evidence that subject matter jurisdiction exists." *Bonime v. Avaya, Inc.*, No. 06-CV-1630, 2006 WL 3751219, at *1 (E.D.N.Y. Dec. 20, 2006), *aff'd*, 547 F.3d 497 (2d Cir. 2008) (citing *Luckett v. Bure*, 290 F.3d 493, 497 (2d Cir. 2002)). Subject matter jurisdiction "must be shown affirmatively, and that showing is not made by drawing from the pleadings inferences favorable to the party asserting it." *Shipping Fin. Servs. Corp.*, 140 F.3d at 131. Instead, when subject matter jurisdiction is at issue, the court may consider relevant documents that are extrinsic to the complaint. *See Phifer v. City of New York,* 289 F.3d 49, 55 (2d Cir. 2002); *Tsirelman v. Daines*, 19 F. Supp. 3d 438, 447 (E.D.N.Y. 2014), *aff'd*, 794 F.3d 310 (2d Cir. 2015).

### C. Rule 12(c) Judgment on Pleadings

Rule 12(c) permits a party to move for judgment on the pleadings "[a]fter the pleadings are closed—but early enough not to delay trial . . . ." Fed. R. Civ. P. 12(c). Granting judgment on the pleadings is appropriate when, after reviewing the record, the court is convinced that the plaintiff has failed to set forth a plausible claim for the requested relief based on the evidence presented. *Milo v. City of New York*, 59 F. Supp. 3d 513, 520 (E.D.N.Y. 2014) (citing *Hayden v. Paterson*, 594 F.3d 150, 161 (2d Cir. 2010)).

In deciding a Rule 12(c) motion, the same standard applicable to motions brought under Rule 12(b)(6) is employed. *Hayden*, 594 F.3d at 160. All factual allegations in the complaint must be accepted as true, and reasonable inferences must be drawn in favor of the plaintiff. *Id.*; *Milo*, 59 F. Supp. 3d at 520. To withstand a motion for judgment on the pleadings, the "well-pleaded factual allegations, assumed to be true, [must] plausibly give rise to an entitlement to relief." *Hayden*, 594 F.3d at 161 (internal quotation marks and citation omitted).

On a Rule 12(c) motion, the court considers:

> [T]he complaint, the answer, any written documents attached to them, and any matter of which the court can take judicial notice for the factual background of the case. A complaint is [also] deemed to include any written instrument attached to it as an exhibit, materials incorporated in it by reference, and documents that, although not incorporated by reference, are 'integral' to the complaint.

*L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 422 (2d Cir. 2011) (internal quotation marks and citations omitted). Included are exhibits attached to a defendant's answer, even though they are only referenced in the party's counterclaims. *See id.* ("There is no question that the email exhibits were "attached" to Old Navy's Answer, even if they were only "part of" Old Navy's Counterclaims."); Fed. R. Civ. P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes").

## V.    Law

### A.    RICO

Pursuant to Title 18, section 1962(c) of the United States Code:

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

18 U.S.C. § 1962(c).

RICO provides a private right of action for "[a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter . . . ." 18 U.S.C. § 1964(c). To state a claim for civil damages under RICO, a plaintiff must first allege that the defendant has violated the substantive RICO statute, 18 U.S.C. § 1962. *See Moss v. Morgan Stanley Inc.*, 719 F.2d 5, 17 (2d Cir. 1983). Second, the plaintiff must allege injury to business or property by reason of the section 1962 violation. *See* 18 U.S.C. § 1964(c); *Moss*, 719 F.2d at 17; *W. 79th St. Corp. v. Congregation Kahl Minchas Chinuch*, No. 03-CV-8606, 2004 WL 2187069, at *4 (S.D.N.Y. Sept. 29, 2004).

To allege a substantive RICO violation, a plaintiff must establish "seven constituent elements: (1) that the defendant (2) through the commission of two or more acts (3) constituting a 'pattern' (4) of 'racketeering activity' (5) directly or indirectly invests in, or maintains an interest in, or participates in (6) an 'enterprise' (7) the activities of which affect interstate or foreign commerce." *Hinterberger v. Catholic Health Sys., Inc.*, 536 F. App'x. 14 (2d Cir. 2013) (quoting *Moss*, 719 F.2d at 16-17); *see also Boykin v. 1 Prospect Park ALF, LLC*, 993 F. Supp. 2d 264, 280-81 (E.D.N.Y. 2014).

### 1.      Racketeering Activity Pattern

Under the RICO statute, to establish a "pattern of racketeering activity" a plaintiff must show "at least two acts of racketeering activity" committed in a ten year period. 18 U.S.C. § 1961(5); *see Azrielli v. Cohen Law Offices*, 21 F.3d 512, 520 (2d Cir. 1994); *Cofacredit, S.A. v. Windsor Plumbing Supply Co.*, 187 F.3d 229, 242 (2d Cir. 1999). A plaintiff must show that the predicate acts of racketeering activity by a defendant are "related, *and* that they amount to or pose a threat of continued criminal activity." *Id.* (quoting *H.J., Inc. v. NW. Bell Tel. Co.*, 492 U.S. 229,

239 (1989)) (emphasis in original).  The continuity required to establish a pattern of racketeering activity can be either "closed-ended" or "open-ended."  *Id.*

### a)      *Closed-ended Continuity*

To fulfil closed-ended continuity, the plaintiff must prove "a series of related predicates extending over a substantial period of time."  *Id.* (quoting *H.J., Inc.*, 492 U.S. at 242); *see also Crawford v. Franklin Credit Mgmt. Corp.*, 758 F.3d 473, 487 (2d Cir. 2014) (defining closed-ended continuity as "past criminal conduct 'extending over a substantial period of time'") (internal citation omitted).  When establishing the relevant time period, only the time during which defendants committed the alleged predicate acts is considered.  *DeFalco v. Bernas*, 244 F.3d 286, 321 (2d Cir. 2001).  Actions that do not constitute predicate acts are not considered.  *See Watral v. Silvernails Farms, LLC*, 177 F. Supp. 2d 141, 148 (E.D.N.Y. 2001), *aff'd sub nom. Watral v. Silvernails Farm LLC.*, 51 F. App'x 62 (2d Cir. 2002) (citing *GICC Capital Corp. v. Tech. Fin. Grp., Inc.*, 67 F.3d 463, 468 (2d Cir. 1995)).

The Court of Appeals for the Second Circuit has noted that periods of less than two years rarely satisfy the "substantial period of time requirement."  *See Cofacredit, S.A.*, 187 F.3d at 242; *GICC Capital Corp.*, 67 F.3d at 467.

"Although closed-ended continuity is primarily a temporal concept, other factors such as the number and variety of predicate acts, the number of both participants and victims, and the presence of separate schemes are also relevant in determining whether closed-ended continuity exists."  *Cofacredit, S.A.*, 187 F.3d at 242; *see also H.J., Inc.*, 492 U.S. at 242.

### b)      *Open-ended Continuity*

To satisfy open-ended continuity, the plaintiff must show that "there was a threat of continuing criminal activity beyond the period during which the predicate acts were performed."

*Cofacredit*, 187 F.3d at 242; *see also H.J., Inc.*, 492 U.S. at 242-43 ("the threat of continuity is sufficiently established where the predicates can be attributed to a defendant operating as part of a long-term association that exists for criminal purposes").

Of particular importance is the nature of the RICO enterprise and of the predicate acts. *See GICC Capital Corp.*, 67 F.3d at 466. Where the enterprise is "engaged primarily in racketeering activity, and the predicate acts are inherently unlawful, there is a threat of continued criminal activity, and thus open-ended continuity." *Cofacredit, S.A.*, 187 F.3d at 242-43. If the enterprise is primarily engaged in a legitimate business, "there must be some evidence from which it may be inferred that the predicate acts were the regular way of operating that business, or that the nature of the predicate acts themselves implies a threat of continued criminal activity." *See id.* at 243; *see also Crawford*, 758 F.3d at 487-88 (2d Cir. 2014) (defining open-ended continuity as "past criminal conduct coupled with a threat of future criminal conduct").

## 2.      Wire Fraud as "Racketeering Activity"

The federal offense of wire fraud, charged in the present case, is a predicate offense which qualifies as "racketeering activity." 18 U.S.C. § 1961(1); *see Crawford*, 758 F.3d at 487 (2d Cir. 2014) ("[R]acketeering activity, as defined in RICO, may consist of any of a number of criminal offenses, 18 U.S.C. § 1961(1), including . . . wire fraud in violation of 18 U.S.C. § 1343.") (internal quotation marks omitted). Mere common-law fraud does not constitute racketeering activity for RICO purposes. *See* 18 U.S.C. § 1961(1); *Cofacredit*, 187 F.3d at 242; *see also Bridge v. Phoenix Bond & Indemnity Co.*, 553 U.S. 639, 652 (2008) ("Congress defined the predicate act not as fraud *simpliciter*, but mail fraud—a statutory offense unknown to the common law.").

The wire fraud statute provides that:

> Whoever, having devised or intending to devise any scheme or
> artifice to defraud, or for obtaining money or property by means of

false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both.

18 U.S.C. § 1343.

The defendant must communicate by wire in "interstate or foreign commerce" in furtherance of a scheme to defraud. 18 U.S.C. § 1343. "[P]urely intrastate communication [is] beyond the statute's reach." *Cofacredit, S.A.*, 187 F.3d at 243 (quoting *Smith v. Ayres*, 845 F.2d 1360, 1366 (5th Cir. 1988)).

### a) *Requisite Scheme to Defraud*

An essential element of wire fraud is a "scheme or artifice to defraud;" it requires "proof that defendants possessed a fraudulent intent." *United States v. Starr*, 816 F.2d 94, 98 (2d Cir. 1987); *see also Beck v. Mfrs. Hanover Trust Co.*, 820 F.2d 46, 49 (2d Cir. 1987) ("In general, the mail and wire fraud statutes require, *inter alia,* a showing of intentional fraud."), *abrogated on other grounds* by *United States v. Indelicato,* 865 F.2d 1370 (2d Cir. 1989); *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 647 (2008) ("The gravamen of the offense is the scheme to defraud . . . .") (quoting *Schmuck v. United States*, 489 U.S. 705, 712 (1989)) (citation and internal quotation marks omitted); *Boykin*, 993 F. Supp. 2d at 281.

The elements of a "scheme to defraud" are "(i) the existence of a scheme to defraud, (ii) the requisite scienter (or fraudulent intent) on the part of the defendant, and (iii) the materiality of the misrepresentations." *Sampson v. Medisys Health Network Inc*., No. 10-CV-1342, 2011 WL 579155, at *5 (E.D.N.Y. Feb. 8, 2011) (quoting *United States v. Autuori*, 212 F.3d 105, 115 (2d Cir. 2000)).

The wired communication need not itself be fraudulent. It must, however, be made in furtherance of the fraudulent scheme. *See Crawford*, 758 F.3d at 488.

"A showing of intentional fraud, or 'reckless indifference to the truth' is necessary to satisfy 'the requisite knowledge and criminal intent' element of mail fraud. Acts done inadvertently, mistakenly, or in good faith without an intent to defraud do not satisfy the requirements of the statute." *O'Malley v. New York City Transit Auth*., 896 F.2d 704, 706 (2d Cir. 1990) (internal citations omitted).

"Where an alleged RICO enterprise primarily conducts a legitimate business, there must be some evidence from which it may be inferred that the predicate acts—which must be in furtherance of fraud in order to constitute mail or wire fraud—were the regular way of operating that business, or that the nature of the predicate acts themselves implies a threat of continued criminal activity." *Crawford*, 758 F.3d at 488 (internal citations and quotation marks omitted) (finding that "[m]ere mailings of monthly statements seeking payment with respect to a single established debt—or communications to the state court in connection with an action on that debt— do not, without more, amount to or suggest a threat of continued criminal activity; the mailings in this case cannot even be viewed as furthering the alleged fraud, for they disclosed to [plaintiff] the existence of the [mortgage] of which she claims to have been unaware").

b)      *Wire Fraud vs. Common Law Fraud*

The statutory offense of wire fraud does not incorporate all of the elements of common-law fraud. The Supreme Court has ruled that the common law requirements of justifiable reliance and damages "plainly have no place in the federal fraud statutes." *See Neder v. United States*, 527 U.S. 1, 24-25 (1999) (noting that, "[b]y prohibiting the 'scheme to defraud,' rather than the completed fraud, the elements of reliance and damage would clearly be inconsistent with the

statutes Congress enacted"); *see also United States v. Rowe*, 56 F.2d 747, 749 (2d Cir. 1932) (L.

Hand, J.) ("Civilly of course the [mail fraud statute] would fail without proof of damage, but that

has no application to criminal liability"); *Bridge*, 553 U.S. at 653 ("Congress chose to make mail

fraud, not common-law fraud, the predicate act for a RICO violation.  And 'the mere fact that the

predicate acts underlying a particular RICO violation happen to be fraud offenses does not mean

that reliance, an element of common-law fraud, is also incorporated as an element of a civil RICO

claim.'") (internal citations omitted).

With respect to the reliance element, the Supreme Court has recognized that:

> [N]one of this is to say that a RICO plaintiff who alleges injury "by
> reason of" a pattern of mail fraud can prevail without showing that
> *someone* relied on the defendant's misrepresentations. . . . In most
> cases, the plaintiff will not be able to establish even but-for
> causation if no one relied on the misrepresentation.

*Id*. at 658 (emphasis in original).

The Court has held that "materiality of falsehood is an element of the federal mail fraud,

wire fraud, and bank fraud statutes."  *Neder*, 527 U.S. at 25.

### c)      *Particular Scrutiny of RICO Claims Based on Wire Fraud Allegations*

Due to the "routine use of mail and wire communications in business operations," courts

must closely scrutinize RICO claims based on allegations of mail or wire fraud, "because of the

relative ease with which a plaintiff may mold a RICO pattern from allegations that, upon closer

scrutiny, do not support it."  *Crawford*, 758 F.3d at 489 (citing *Efron v. Embassy Suites (Puerto

Rico), Inc.*, 223 F.3d 12, 20 (1st Cir. 2000), *cert. denied,* 532 U.S. 905 (2001)); *see also Bell v.

Hubbert*, No. 95-CV-10456, 2007 WL 60513, at *5 (S.D.N.Y. Jan. 8, 2007) ("Because the mere

assertion of a RICO claim . . . has an almost inevitable stigmatizing effect on those named as

defendants . . . *courts should strive to flush out frivolous RICO allegations at an early stage of the*

*litigation*.") (internal citations and quotation marks omitted) (emphasis supplied); *W. 79th St. Corp.*, 2004 WL 2187069 at *5 ("[C]ourts must be wary of putative civil RICO claims that are nothing more than sheep masquerading in wolves' clothing."); *Goldfine v. Sichenzia*, 118 F. Supp. 2d 392, 394 (S.D.N.Y. 2000) ("I surmise that every member of the federal bench has before him or her at least one—and possibly more—garden variety fraud or breach of contract cases that some Plaintiff has attempted to transform into a vehicle for treble damages by resort to what [has been] referred to as 'the litigation equivalent of a thermonuclear device'—a civil RICO suit.") (internal citations omitted); *Spoto v. Herkimer Cty. Trust*, No. 99-CV-1476, 2000 WL 533293, at *1 (N.D.N.Y. 2000) ("[S]ome legal minds posit that the civil provisions of [RICO] are the most misused statutes in the federal corpus of law.").

### 3.        Rule 9(b) Particularity Requirement

Where the predicate acts alleged involve mail or wire fraud, allegations must satisfy the particularity requirement of Rule 9(b) of the Federal Rules of Civil Procedure. *See McLaughlin v. Anderson*, 962 F.2d 187, 191 (2d Cir. 1992); *W. 79th St. Corp.*, 2004 WL 2187069 at *6-7; *Sampson*, 2011 WL 579155 at *5 ("To successfully plead a RICO claim, the circumstances constituting the alleged fraud must be pled with particularity") (internal citations and quotation marks omitted); *Plount v. Am. Home Assurance Co.*, 668 F. Supp. 204, 206 (S.D.N.Y. 1987) ("[A]ll of the concerns that dictate that fraud be pleaded with particularity exist with even greater urgency in civil RICO actions . . . .").

Federal Rule 9(b) provides:

> In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally.

Fed. R. Civ. P. 9(b).

To satisfy Rule 9(b), a complaint "must adequately specify the statements it claims were false or misleading, give particulars as to the respect in which plaintiff contends the statements were fraudulent, state when and where the statements were made, and identify those responsible for the statements." *W. 79th St. Corp.*, 2004 WL 2187069 at *6-7 (S.D.N.Y. Sept. 29, 2004) (quoting *Cosmas v. Hassett*, 886 F.2d 8, 11 (2d Cir. 1989); *see also Zaro Licensing, Inc. v. Cinmar, Inc.*, 779 F. Supp. 276, 281 (S.D.N.Y. 1991) ("Allegations of fraud must therefore specify the fraudulent statement, the time, place, speaker and content of the alleged misrepresentations") (citing *Luce v. Edelstein,* 802 F.2d 49, 54 (2d Cir. 1986)).

"While knowledge of the fraud or intent to defraud on the part of the defendant may be averred generally, Rule 9(b) also requires such allegations of 'scienter' to be supported by facts giving rise to a strong inference that defendant knew the statements to be false and intended to defraud plaintiff." *Arons v. Lalime*, 3 F. Supp. 2d 314, 325 (W.D.N.Y. 1998) (citing *Ouaknine v. MacFarlane*, 897 F.2d 75, 79-80 (2d Cir. 1990)). The plaintiff must allege "(1) specific facts; (2) sources that support the alleged specific facts; and (3) a basis from which an inference of fraud may fairly be drawn." *Crystal v. Foy*, 562 F. Supp. 422, 425 (S.D.N.Y. 1983).

Allegations of mail or wire fraud must also "specify the use of the mails and wires with particularity." *Zaro Licensing, Inc.*, 779 F. Supp. at 281.

Where more than one defendant is charged with wire fraud, the plaintiff must "particularize and prove each defendant's participation in the fraud and each defendant's enactment of the two necessary predicate acts." *USA Certified Merchs., LLC v. Koebel*, 262 F. Supp. 2d 319, 332 (citing *DiVittorio v. Equidyne Extractive Indus., Inc.*, 822 F.2d 1242, 1247 (2d Cir. 1987)); *W. 79th St. Corp.*, 2004 WL 2187069 at *6-7.

### 4. Wire Fraud vs. Breach of Contract

A breach of contract, without more, does not amount to actionable wire fraud. *See, e.g*, *Zaro Licensing, Inc.*, 779 F. Supp. 276, 282 (S.D.N.Y. 1991) ("[T]he court found that at best the allegations centered around a business dispute involving a breach of contract. That the plaintiffs embellished this breach by setting forth the contents of various documents, correspondence, telefaxes, telephone calls and meetings between the parties did not support the existence of a RICO scheme, requiring dismissal."); *see also Regency Commc'ns, Inc. v. Cleartel Commc'ns, Inc.*, 160 F. Supp. 2d 36, 44 (D.D.C. 2001) ("[A] simple breach of contract claim, uncolored by any acts of deception, does not constitute mail fraud.").

In *Sampson v. Medisys Health Network Inc.* the court found that a Fair Labor Standards Act case essentially sounded in a contract dispute between an employer and an employee, with no fraud content. It rejected plaintiffs' RICO claims:

> The Second Circuit has been unwilling to find a fraud claim when the claim is merely a restatement of a breach of contract claim.
>
> Plaintiffs may maintain a claim of fraud in this circumstance where they (i) demonstrate a legal duty separate from the duty to perform under the contract; or (ii) demonstrate a fraudulent misrepresentation collateral or extraneous to the contract; or (iii) seek special damages that are caused by the misrepresentation and unrecoverable as contract damages.
>
> Although plaintiffs allege fraud as a cause of action, the allegations of fraud are based upon defendants' failure to pay plaintiffs pursuant to the employment contract. As all of plaintiffs' claims rely upon the existence of a contract requiring defendants to pay plaintiffs for 'all hours worked,' and plaintiffs have not adequately alleged the *Bridgestone/Firestone* elements, they cannot make out a claim for fraud or mail fraud.

*Sampson*, 2011 WL 579155 at *6 (E.D.N.Y. Feb. 8, 2011) (internal citations and quotation marks omitted).

### 5.    Conspiracy

Section 1962(d) makes it "unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section."  18 U.S.C. § 1962(d).  To state a RICO conspiracy claim under section 1962(d), a plaintiff must allege a substantive RICO violation. *Cofacredit*, 187 F.3d at 244; *Allen v. New World Coffee, Inc.*, No. 00-CV-2610, 2001 WL 293683, *9 (S.D.N.Y. Mar. 27, 2001).  If a plaintiff fails to adequately make out a substantive RICO violation, his conspiracy claim must be dismissed.  *See Burke v. Town of E. Hampton*, Nos. 99-CV-5798, 99-CV-5799, 2001 WL 624821, *17 (E.D.N.Y. Mar. 16, 2001); *Watral*, 177 F. Supp. 2d at 151; *Cofacredit*, 187 F.3d at 245.  *See also Crawford*, 758 F.3d at 489 ("In addition, we conclude that Defendants were entitled to summary judgment dismissing [the] § 1962(d) RICO conspiracy claims. 'A conspirator must intend to further an endeavor which, if completed, would satisfy all of the elements of a substantive criminal offense . . . .' [Plaintiff] presented no evidence of any agreement by Defendants to engage in conduct of the type that would be sufficient to constitute a pattern of racketeering activity.") (internal citations omitted).

## VI.    Application of Law to Facts

### A.    Plaintiff Failed to Plead RICO Violation

#### 1.    Dispute Contractual

Plaintiff has failed to establish the necessary elements of a RICO claim.  The parties' pleadings and supporting exhibits, when viewed in the light most favorable to the plaintiff, set forth nothing more than a contract dispute.  No one alleges that the claims submitted by Academy were not medically based, that the equipment in question was not delivered to the patients in need, or that the equipment's cost was different from what was claimed.  Academy IPA's acting as an IPA cannot be deemed to be inherently fraudulent—managed care organizations regularly contract

with either providers or IPAs to supply healthcare products to their enrollees, and such arrangements are permitted by New York State law. *See* 10 NYCRR 98-1.2(w) (defining IPA as an entity which "contracts directly with providers of medical or medically related services or another IPA in order that it may then contract with one or more [managed care organizations] to make the services of such providers available to the enrollees of [a managed care organizations]"). The sole question in dispute is whether, as a contract matter, Academy had the authority to act as an IPA *pursuant to its existing Agreement with Fidelis*.

Fidelis itself presented the issue in contractual terms on multiple occasions. For example, in its Notice of Material Breach letter, Fidelis noted that the contractually unauthorized payments to "uncredentialed providers" resulted in "an overpayment" and that Fidelis would "pursue all available remedies to recover these overpayments." *See* Countercl. at Ex. 21. Fidelis gave Academy the opportunity to "cure" the breach. *Id.* In a subsequent letter to Academy, Fidelis noted that Mr. Daskal's attempts to obtain a formal IPA agreement amounted to "further proof that your client is aware that there is no IPA Agreement between the parties and [that Academy] is *operating in breach of contract*." *Id.* at Ex. 22 (emphasis supplied). Fidelis reiterated that it "consider[ed] the use of uncredentialed providers to be a very serious matter" and that, if it did not hear from Academy, it would "pursue all available remedies to recover any identified overpayments, which include but are not limited to services rendered by uncredentialed providers." *Id.*

Whether plaintiff is entitled to any overpayments turns on whether Academy had the authority to act as an IPA—a question of contract interpretation. Plaintiff may have a civil cause of action against defendants, but the remedy lies in an action for breach of contract, not in a civil RICO claim premised on wire fraud. Plaintiff's allegations regarding Academy's alleged "kick-

back" scheme at most suggest that Academy was acting as an IPA—collecting fees from providers within its network—and that this was in breach of the parties' agreement. Characterizing a commercial fee-based relationship as a "kick-back" does not make it one. The requisite scienter needed to sustain a civil RICO claim premised on allegations of wire fraud has not been stated and cannot be proven.

## 2. Predicate Acts Not Pled

Even were plaintiff allowed to plead a RICO claim based solely on a contractual breach, it fails to plead or establish the existence of the required predicate acts showing a pattern of racketeering activity, whether open-ended or closed-ended. In order to make out predicate acts of wire fraud, a plaintiff must demonstrate the existence of a scheme to defraud. *See supra* at 34-35. The documents submitted by the parties demonstrate beyond dispute that information concerning the existence and identity of the actual equipment providers was made available to Fidelis by defendants. Plaintiff fails to allege and cannot establish the required scienter necessary to sustain allegations of wire fraud.

According to plaintiff, defendants engaged in a pattern of racketeering activity consisting of repeated violations of the wire fraud statute "based upon the use of the wires in interstate commerce to submit or cause to be submitted thousands of fraudulent bills on a continuous basis for more than three years." Compl. at ¶ 62. In support of this claim, plaintiff submits a chart titled "Representative Sample of Fraudulent Billing." *Id*. at Ex. 1. The chart lists 52,933 claims allegedly submitted by Academy between 2012 and 2015, which plaintiff categorizes as "RICO events." An excerpt from that document is included below:

New York State Catholic Health Plan, Inc., d/b/a/ Fidelis Care New York v.  Academy O and P Associates, et al.

**Exhibit "1" - Representative Sample of Fraudulent Billing**

| RICO Event | Provider Name (Billing Submission) | Claim No. | NPI No. (Rendering Provider) | Service Date | Electronic Claim Submission Date | Procedure Code Description | Code | Charge |
|---|---|---|---|---|---|---|---|---|
| 1 | Academy Orthotic & Prosthetic Associates | 003585714000 | 1346265212 | 10/1/2011 | 11/09/2011 | Nondisposable Nebulizer Set | A7005 | $35.00 |
| 2 | Academy Orthotic & Prosthetic Associates | 003585714000 | 1346265212 | 10/1/2011 | 11/09/2011 | Nebulizer With Compression | E0570 | $249.00 |
| 3 | Academy Orthotic & Prosthetic Associates | 003615213800 | 1346265212 | 10/3/2011 | 11/18/2011 | Cer Post Col Occ/Man Sup Adj | L0180 | $343.00 |
| 4 | Academy Orthotic & Prosthetic Associates | 003701435200 | 1346265212 | 10/3/2011 | 12/21/2011 | Kyphosis Pad | L1020 | $292.40 |
| 5 | Academy Orthotic & Prosthetic Associates | 003701435200 | 1346265212 | 10/3/2011 | 12/21/2011 | Outrigger | L1080 | $93.62 |
| 6 | Academy Orthotic & Prosthetic Associates | 003701435200 | 1346265212 | 10/3/2011 | 12/21/2011 | Covers For Upright Each | L1120 | $67.18 |
| 7 | Academy Orthotic & Prosthetic Associates | 003701435200 | 1346265212 | 10/3/2011 | 12/21/2011 | Anterior Thoracic Extension | L1220 | $499.68 |
| 8 | Academy Orthotic & Prosthetic Associates | 003701435200 | 1346265212 | 10/3/2011 | 12/21/2011 | Anterior Asis Pad | L1250 | $244.40 |

*Id*.

Academy's behavior was fraudulent, plaintiff contends, because it intentionally withheld its identity as an IPA and used "Academy O&P" as a "front" to conceal the fact that the supplies were being provided by "uncredentialed" third parties.  Plaintiff argues that the claims listed in Exhibit 1 substantiate its allegations of fraud as Academy only listed its own NPI number on the forms, and not that of the third-party providers.  *See* Countercl. at Ex. 15; *see also* Hr'g Tr., Dec. 15, 2015.

Yet, the claim forms include information identifying the third-party suppliers.  Below is an excerpt from a standard claim form:



*Id*. at Ex. 15.  As shown in the above excerpt, although Academy is listed as the "Billing Provider," the "Service Facility Location Information" identifies the third-party supplier.  The court makes no determination as to whether claims such as the one above were properly submitted.  It is possible that Academy improperly used its own NPI or acted in breach of its contractual agreement with

43

Fidelis.  What the document does indicate, however, is that Academy was not fraudulently concealing the origin of the supplies in question.

Defendants repeatedly provided adequate information to Fidelis of transactions pursuant to the contract.  *See* Countercl. at Exs. 12-14.  For example, on December 9, 2013, "Academy Orthotic & Prosthetic IPA" sent a letter to Fidelis regarding "[s]upporting documentation for the patients listed below."  *Id*. at Ex. 14.  The letter includes reference to Academy's website "www.AcademyIPA.com."  It attaches delivery invoices from "Meik Medical Equipment & Supply" for items such as "motorized wheelchair," "knee brace," and "orthopedic mattress."  *Id*. Plaintiff's allegation that Academy IPA was concealing the fact that it was fulfilling orders through the use of third-party suppliers is contradicted by the uncontested documentary evidence.

Plaintiff alleges that it discovered throughout the course of its investigation that "many of the Third-Party Companies whose claims were submitted by the Defendants . . . through Academy to Fidelis for reimbursement are not and were never eligible to dispense Supplies to Enrollees." Compl. at ¶ 47.  Fidelis provided a "representative list" of such providers, copied below:

| Third-Party Provider/Entity Name | City | State | Medicare No. | NPI Number |
|---|---|---|---|---|
| 21st Avenue Pharmacy | Elmhurst | New York | 6710600001 | Not Found |
| 888 Pharmacy, Inc. | Brooklyn | New York | 6754310001 | 1417297698 |
| Accredited Medical Supply | Woodhaven | New York | 6867720001 | 1710225511 |
| Alba Medical Supply | Brooklyn | New York | 0701360001 | 1023232501 |
| All Pro Medical Supplies | Patchogue | New York | 5021150001 | 1356356760 |
| All Pro Medical Supplies | Plainview | New York | 5021150001 | 1588670921 |
| All South Shore Medical | Oceanside | New York | 6714600001 | 1760760755 |
| American Medical Supply | Brooklyn | New York | 5088450001 | 1033181532 |
| Anfex Medical Supply | Brooklyn | New York | 1295783926 | 1891855342 |
| Angisa Medical Supplies | Queens Village | New York | 6920160001 | 1669728762 |
| B&S Medical Supply | Brooklyn | New York | 4287900001 | 1225023625 |
| Best Home Care Medical | Brooklyn | New York | 6041270001 | 1437348596 |
| Better Life Medical Supplies | Brooklyn | New York | 4426330001 | 1497743157 |
| Better Life Medical Supplies | Brooklyn | New York | 4426330001 | 1447248190 |
| Blue Shield Medical Supply | Lynbrook | New York | 7141150001 | 1750797957 |
| Cohens Medical Supplies | Bronx | New York | 662040001 | Not Found |
| Divine Health Med. Supplies | Bronx | New York | 6457990001 | 1487994026 |
| Enat Surgical Supply | Brooklyn | New York | 6452750001 | 1720306897 |
| G&L Medical Equipt. & Supplies | Brooklyn | New York | 1137180001 | Not Found |
| Global Health Care Supply | Elmhurst | New York | 6710600001 | 1518232750 |
| Global United Medical Supplies | Brooklyn | New York | 0801460001 | 1841229945 |
| Health First Medical Supplies | Brooklyn | New York | 6386170001 | 1073759148 |
| Health Support Medical Supply | Brooklyn | New York | 4245300001 | 1831174259 |
| Heel To Toe Foot Center | Bronx | New York | 5732620001 | 1306884028 |

| | | | | |
|---|---|---|---|---|
| Insured Medical Supply | Oceanside | New York | 7115150001 | 1356693162 |
| Interfaith Medical Supply | Brooklyn | New York | 7243770001 | 1508283904 |
| Lorox Services | Brooklyn | New York | 6212730001 | 1770732489 |
| Medical Equipment Repairs & Dist | Brooklyn | New York | 4565810001 | 1780782458 |
| Meik Medical Equip & Supply | Bronx | New York | 6389230001 | 1528392388 |
| Murphy Homecare | Oneonta | New York | 5836510001 | 1265592323 |
| National Medical & Surgical Supply | Fresh Meadows | New York | 6123320001 | 1831364397 |
| N&L Medical Supply | Brooklyn | New York | 4576390001 | Not Found |
| NYOPA | New Hyde Park | New York | 6456780001 | 1730383175 |
| Pace Medical Supply | Brooklyn | New York | 6726690001 | 1841544327 |
| Pacific Surgical Supply | Brooklyn | New York | 6092800002 | 1780868877 |
| Park Avenue Orthotics | New York | New York | 0150410001 | 1356453393 |
| Prestige Medical Supply | Brooklyn | New York | 6511310001 | 1467686485 |
| Prothotics Health | Patchogue | New York | 0445310001 | Not Found |
| Quick Fill Pharmacy | Springfield Gardens | New York | 6615400001 | 1932493475 |
| Rehab Solutions | Roosevelt | New York | A08002683 | 1124154869 |
| RX Warehouse Pharmacy | Brooklyn | New York | 6128270001 | 1801057740 |
| Silver Pharmacy | Brooklyn | New York | 6575690001 | Not Found |
| Sky Medical Supply | Middle Village | New York | 5900460001 | 1821131541 |
| Ultra Medical Supply | Brooklyn | New York | 1183320001 | 1922115690 |
| Unicare Medical Supply | Brooklyn | New York | 6852910001 | 1437498573 |
| Universal Supply Depot | Brooklyn | New York | 5526060001 | 1225006992 |
| Valley Home Care | Valley Stream | New York | 1135350002 | 1518981141 |
| White Aid Medical Supply | Brooklyn | New York | 5447540001 | 1093716334 |

*Id*. at ¶ 48.

Yet, the documents show that the existence of some of the providers listed above had been disclosed by Academy IPA in prior communications with Fidelis. For example, the list above includes "Meik Medical Equipment and Supply," the same company whose invoices were submitted to Fidelis in December 2013. *See supra* at 44; Countercl. at Ex. 14. In a communication dated March 18, 2013, Jack Tiernan from Academy IPA wrote to Nettie Wright at Fidelis Care, providing a list of "Academy O&P Associates Patient Care Centers." Countercl. at Ex. 13. That list appears to include some of the same entities listed in the chart above, such as "Academy/Heel to Toe Foot Center," "Academy/White Aid Medical" and "Academy/Park Ave. Orthotics." *Id*.

The pleadings and accompanying documentation, when considered in the light most favorable to the plaintiff, fail to demonstrate the existence of the required "scheme to defraud" necessary to sustain a claim of wire fraud. Plaintiff's claim rests essentially on one issue: whether Academy had the authority to act as an IPA pursuant to the 2014 Fidelis Agreement. This is a garden-variety question of contract interpretation. No separate fraudulent misrepresentation has been set out. Plaintiff's fraud allegations are centered on the claim that Fidelis did not know that Academy was acting as an IPA, due to Academy's allegedly purposeful concealment. This claim is not supported by documentary or any other available evidence. Academy's communications with Fidelis, including the claim forms themselves, show that Academy was not fraudulently concealing its use of third-party suppliers.

Plaintiff has failed to establish the necessary predicate acts in support of its RICO allegations. Its substantive RICO claim must be dismissed.

### 3. Conspiracy Claim Fails

Because plaintiff failed to establish a substantive RICO violation, its claim of a RICO conspiracy also fails. *See Watral*, 177 F. Supp. 2d at 151; *Cofacredit*, 187 F.3d at 245.

## VII. State Claims: Supplemental Jurisdiction Denied

No state contract or tort claim has been sufficiently examined to warrant exercise of supplemental jurisdiction. *See* 28 U.S.C. § 1367(c)(3) ("The district courts may decline to exercise supplemental jurisdiction over a claim . . . [if] the district court has dismissed all claims over which it has original jurisdiction."); *see also N.Y. Mercantile Exch., Inc. v. Intercontinentalexchange, Inc.*, 497 F.3d 109, 119 (2d Cir. 2007) ("In general, where the federal claims are dismissed before trial, the state claims should be dismissed as well.") (citing *Marcus v. AT&T Corp.*, 138 F.3d 46, 57 (2d Cir. 1998)); *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988) ("[I]n the usual

case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims.").

## VIII.   Leave to Amend Denied

No amendment to the complaint could cure the defects in plaintiff's RICO claim. Permission to amend is denied.  *See In re Am. Exp. Co. S'holder Litig.*, 39 F.3d 395, 402 (2d Cir. 1994) ("[L]eave to amend may be denied if the amendment would be futile."); *see also Pac. Inv. Mgmt. Co. LLC v. Mayer Brown LLP*, 603 F.3d 144, 160 (2d Cir. 2010) (finding that there was "no basis for suggesting, much less concluding, that plaintiffs could amend their claims . . . in a way that would make them viable"); *Petroleos Mexicanos v. SK Eng'g & Const. Co.*, 572 F. App'x 60, 61 (2d Cir. 2014) (declining to remand with direction to permit amendment where "[plaintiff] has not adduced any information that would demonstrably alter the substance of its complaint").

## IX.   Counterclaims and Third-Party Claims Dismissed

Plaintiff's RICO allegations were the only federal claims raised.   Defendants' counterclaims against Fidelis and third-party claims against Healthfirst and Thomas raise only state law causes of action that do not warrant the exercise of supplemental jurisdiction.  The parties have agreed that these claims should be dismissed for lack of jurisdiction if the complaint is dismissed.  *See* Hr'g Tr., Dec. 15, 2015.

## X.   Conclusion

Plaintiff's claims of violations of 18 USC §§ 1962(c) and (d) are dismissed.  Without the RICO claims, there is no basis for subject matter jurisdiction.  Plaintiff's remaining claims are

dismissed for lack of jurisdiction.  Defendants' counterclaims and third-party claims raise only

state law causes of actions and are dismissed for lack of jurisdiction.


                                                 SO ORDERED.


                                                 <u>/s/ Jack B. Weinstein</u>
                                                 Jack B. Weinstein
                                                 Senior United States District Judge

Date:   December 18, 2015
        Brooklyn, New York